1  JOHN C. KLOOSTERMAN, Bar No. 182625
   LAURA E. HAYWARD, Bar No. 204014
2  LITTLER MENDELSON
   A Professional Corporation
3  650 California Street, 20th Floor
   San Francisco, CA  94108.2693
4  Telephone:    415.433.1940

5  Attorneys for Defendants
   24 HOUR FITNESS USA, INC. AND SPORT AND
6  FITNESS CLUBS OF AMERICA

7

8                      UNITED STATES DISTRICT COURT

9                    NORTHERN DISTRICT OF CALIFORNIA

10                      SAN FRANCISCO DIVISION

11  GABE BEAUPERTHUY, et. al.,            Case No. C 06 0715 SC

12              Plaintiffs,              **NOTICE OF MOTION, MOTION AND**
                                         **MEMORANDUM OF POINTS AND**
13        v.                             **AUTHORITIES IN SUPPORT OF**
                                         **DEFENDANTS' MOTION TO STRIKE**
14  24 HOUR FITNESS USA, INC. a          **PLAINTIFFS' DECLARATIONS**
    California corporation dba 24 HOUR
15  FITNESS; SPORT AND FITNESS           Date:   January 21, 2011
    CLUBS OF AMERICA, INC., a California Time:   10:00 a.m.
16  corporation dba 24 HOUR FITNESS,     Judge: Hon. Samuel Conti

17              Defendants.

18

19

20

21

22

23

24

25

26

27

28

LITTLER MENDELSON
A Professional Corporation
650 California Street
20th Floor
San Francisco, CA  94108.2693
415.433.1940

**DEFTS' MOTION TO STRIKE PLAINTIFFS'**                    Case No.  C 06 0715 SC
**DECLARATIONS**

1  **NOTICE OF MOTION AND MOTION**

2  **TO PLAINTIFFS AND THEIR ATTORNEYS OF RECORD:**

3  PLEASE TAKE NOTICE that on January 21, 2011, at 10:00 a.m., or as soon

4  thereafter as the matter may be heard in Courtroom 1, 17th Floor of the United States District Court

5  of the Northern District of California, located at 450 Golden Gate Ave., San Francisco, California

6  94102, before the Honorable Samuel Conti, Defendants 24 Hour Fitness USA, Inc. and Sport and

7  Fitness Clubs of America ("Defendants") will, and hereby do, move for an Order to Granting

8  Defendants' Motion To Strike Plaintiffs' Declarations, specifically, all declarations filed by

9  Plaintiffs in support of their oppositions to Defendants' motions to decertify (Docket # 387-401).

10  This motion is made on the ground that the declarations of individuals previously

11  deposed contradict the declarants' prior deposition testimony and prior declaration testimony. Thus,

12  all of the declarations are suspect and without credibility and should be stricken from the record.

13  This Motion is based on this Notice, the Memorandum of Points and Authorities in

14  support thereof, the accompanying declarations and exhibits, the papers and pleadings on file in this

15  case, and all other evidence and argument as may be presented at the hearing on the motion.

16  **STATEMENT OF THE ISSUES**

17  Should the declarations filed by Plaintiffs in support of their opposition to

18  Defendants' decertification motions (Docket #387-401) be stricken in their entirety for lack of

19  credibility?

20  **MEMORANDUM OF POINTS AND AUTHORITIES**

21  **I.    INTRODUCTION**

22  All of the declarations filed by Plaintiffs in support of their opposition brief should be

23  stricken in their entirety.  The declarations of individuals previously deposed are inconsistent with

24  the declarants' deposition testimony and prior declaration testimony.  As such, all of the declarations

25  are suspect and entitled to no weight whatsoever.  All of those declarations should be stricken from

26  the record.

27

28

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
650 California Street
20th Floor
San Francisco, CA 94108 2693
415 433 1940

**DEFTS' MOTION TO STRIKE PLAINTIFFS' DECLARATIONS**            1.            **Case No.  C 06 0715 SC**

## II.   STATEMENT OF FACTS

Plaintiffs filed a motion for collective certification of manager and personal trainer subclasses, supported in part by declarations of putative class members including but not limited to Kelly Fennelly (also known as Kelly Hillenbrand) and John Davidsson. (Docket #73, 75.)

During discovery, Defendants deposed the following individuals, as well as others: (1) Gabe Beauperthuy, (2) Clifford Cotton, (3) William Clunn, (4) Natalie Cromartie, (5) Seth Daniels, (6) John Davidsson, (7) Bobby DeSoto, (8) Lawrence Dickerson, (9) Anne Dillon, (10) Toni Fiedler, (11) Tina Flores, (12) Garth Gelker, (13) Adam Grubbs, (14) Victoria Hadipour, (15) Shane Hedani, (16) Cory Hennessey, (17) Kelly Hillenbrand, (18) Michelle Janke, (19) Brent Johnson, (20) David Kaipi, (21) Quinton Kaplan, (22) Belton Lubas, (23) Cindy Magnani, (24) Michael Marino, (25) Richard McGrath, (26) Megan Olsen, (27) Louis Ortiz, (28) Joeleen Palmeri, (29) Carmen Pieske, (30) Alfred Ra-Oof, (31) Patricia Rangasajo, (32) Matthew Reiter, (33) Bonnie Rinta, (34) Chad Ruf, (35) Dennis Sciacca, (36) Harley Spencer, (37) Lawrence Srubas, (38) Maika Symmonds, (39) Connie Wusterbarth, and (40) Stephanie Yamada.  Plaintiffs' counsel, as well as Defendants' counsel, had opportunity to ask questions of those deponents and often did.  *See e.g.* Declaration Of John Kloosterman In Support Of Defendants' Motion To Strike (hereinafter "Kloosterman Decl.") Exh. A-C (Deposition of Chad Ruf at 231-241; Deposition of Joeleen Palmieri at 241-147; Deposition of Alfred Ra'Oof at 186-202).  Some of those witnesses served erratas to their deposition transcripts. Kloosterman Declaration Exh. D.

After the close of discovery, Defendants filed a Motion To Decertify the Conditional Manager Class and Motion To Decertify The Conditional Personal Trainer Class, both of which relied in part on Plaintiffs' deposition testimony. (Docket # 362, 371).

Plaintiffs opposed Defendants' decertification motions.  (Docket #385, 386).  With that filing, Plaintiffs submitted the declarations of the forty individuals listed above.  As discussed more fully below, those declarants blatantly contradicted their prior sworn deposition testimony.  Moreover, at least two individuals contradicted their prior declaration testimony.  Examples of those contradictions are set forth in Exhibit A hereto.  Because of those inconsistencies, all of the declarations should be stricken from the record as untrustworthy.

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
650 California Street
20th Floor
San Francisco, CA 94108-2693
415.433.1940

DEFTS' MOTION TO STRIKE PLAINTIFFS'
DECLARATIONS                        2.                     Case No. C 06 0715 SC

III.    **ARGUMENT**

A.    **All Of Plaintiffs' Declarations Should Be Stricken, Because The Deponents' Declarations Contradict Their Sworn Deposition Testimony.**

All of Plaintiffs declarations should be disregarded.   Courts routinely reject subsequent conflicting testimony in the summary judgment context.   Under the sham affidavit rule, "a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony." *Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 266 (9th Cir. 1991); *see also Bosinger v. Belden CDT, Inc.*, 358 Fed. Appx. 812, 815 (9th Cir. 2009) ("A party may not create an issue of fact by affidavit contradicting prior deposition testimony"); *Cleveland v. Policy Management Systems Corp.*, 526 U.S. 795, 806 (1999) (noting that the lower courts have held "with virtual unanimity that a party cannot create a genuine issue of fact...simply by contradicting his or her own previous sworn statement...without explaining the contradiction or attempting to resolve the disparity").

Similarly, the Ninth Circuit rejects errata changes that conflict with deposition testimony.   Rule 30(e), which provides opportunity to review and make changes to a deposition transcript, may be used only for corrective, not contradictory, changes.   Fed. R. Civ. Proc. 30(e)(1); *Hambleton Brothers Lumber Co. v. Balkin Enterprises, Inc.*, 397 F.3d 1217, 1225 (9th Cir. 2005) ("While the language of FRCP 30(e) permits corrections...this permission does not properly include changes offered solely to create a material factual dispute in a tactical attempt to evade an unfavorable summary judgment"); *Lewis v. CCPOA Ben Trust Fund*, 2010 U.S. Dist. LEXIS 95739, *5 (N.D. Cal. 2010) ("In the Ninth Circuit, Rule 30(e) deposition changes are subject to the "sham rule," which precludes a party from manufacturing an issue of fact by submitting errata or an affidavit that contradicts prior deposition testimony").   In *Hambleton*, the Ninth Circuit followed *Garcia v. Pueblo Country Club*, 299 F.3d 1233, 1242 n.5 (10th Cir. 2002), which explained:

> [Rule 30(e)] cannot be interpreted to allow one to alter what was said under oath. If that were the case, one could merely answer the questions with no thought at all then return home and plan artful responses.  Depositions differ from interrogatories in that regard. A deposition is not a take home examination.'

*Id.* (quoting *Greenway v. Int'l Paper Co.*, 144 F.R.D. 322, 325 (W.D. La. 1992)).

LITTLER MENDELSON
A Professional Corporation
650 California Street
20th Floor
San Francisco, CA 94108 2693
415 433 1940

**DEFTS' MOTION TO STRIKE PLAINTIFFS' DECLARATIONS**                    3.                    Case No.  C 06 0715 SC

1    Courts have rejected subsequent contradictory testimony in other contexts. For

2    example, in *Faralli v. Hair Today, Gone Tomorrow*, 2007 U.S. Dist. LEXIS 1977 (N.D. Ohio Jan.

3    10, 2007) the plaintiff, alleging that the defendant engaged in a coordinated fraudulent marketing

4    campaign, filed a motion for class certification under Rule 23. The defendant claimed that the

5    plaintiff lacked standing and was not a member of the purported class, pointing to the fact that the

6    plaintiff did not testify that she saw or relied on the defendant's ads. *Id.* at *25. The plaintiff

7    submitted a newly executed affidavit wherein she averred that she saw a newspaper ad in which the

8    defendant claimed it could eliminate her unwanted hair. *Id.* at *25-26. The defendant filed a motion

9    to strike the affidavit on the basis that the affidavit directly contradicted her prior testimony, and did

10   not explain why the new averments were not included in the plaintiff's first affidavit. *Id.* at *26-27.

11   The court granted the defendant's motion to strike, finding it was "an unfair attempt to now fill the

12   gap left in her deposition when questioned as to how she first learned of [Hair Today, Gone

13   Tomorrow]." *Id.* at *27.

14   Also, in *Reid v. Lockheed Martin Aeronautics Co.*, 205 F.R.D. 655 (N.D. Ga. 2001),

15   the plaintiffs, bringing racial discrimination claims, sought class certification under Rule 23. The

16   defendants urged the court to disregard statements in several affidavits submitted by the plaintiffs on

17   the ground that the statements were contradicted by the affiants' deposition testimony. *Id.* at 663.

18   The court noted that several statements in the affidavits were in fact contradicted by the deposition

19   testimony, and that the depositions cast doubt on the accuracy of several other statements contained

20   in the affidavits. Nonetheless, the court held that for purposes of resolving the plaintiffs' motions for

21   class certification, it would not strike the affidavits of the putative class members. *Id.* However, the

22   court also stated: "Where those affidavits are expressly contradicted by deposition testimony without

23   explanation, . . . the deposition testimony will control." *Id.* (emphasis added).

24   Here, the new declarations conflict with prior deposition testimony. See Exhibit A

25   hereto. For example, Lawrence Srubas testified during deposition that after the time and labor

26   system was implemented, he clocked in when he arrived and clocked out when he left or when his

27   shift was over, and that he was paid for all hours for which he was clocked in. He claims in his

28

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
650 California Street
20th Floor
San Francisco, CA 94108.2693
415.433.1940

**DEFTS' MOTION TO STRIKE PLAINTIFFS'
DECLARATIONS**                           4.                    Case No.  C 06 0715 SC

declaration that he really meant that he sometimes kept working after he clocked out.  Specifically, his deposition testimony was:

> \* \* \*
>
> Q.  Do you remember when the time-and-labor system came into the club?
>
> A.  I don't remember that.
>
> Q.  You were still at Addison?
>
> A.  Yes.
>
> Q.  How did it change when time and labor was implemented?
>
> A.  *We would clock in when we got there, we would clock out when we left, or when we were finished with a particular task with our -- with our shift.*
>
> Q.  And you were paid for all the hours that you were clocked in?
>
> A.  Yes.

Kloosterman Declaration Exh. E (Srubas Depo. 69:19-70:15) (emphasis added).   He attempts to evade this concession in his declaration by stating:

> In 24 Hour's Decertification Motion re Trainers (17:2-4), 24 Hour cites to my testimony at 69:19-70:15, claiming that I said that after time and labor was implemented, I was paid for all non-session time. Yet, in the cited testimony, I explained that we would clock out when we left or when our shift was over.  *I never said that I had to stop working off-the-clock or that all of my non-session work was accurately recorded. In fact, I am trying to explain in the testimony that it was more tied to when we finished a specific task or our shift was over. Sometimes that coincided with when we left the club.*  But, for the duration of my employment, the FIT Hours Budget and dual time-keeping system remained in place.

Srubas Decl. ¶40 (Docket #400) (emphasis added).

Seth Daniels (also known as Seth Bregman) testified in deposition that he estimated his highest earnings at $160,000.  Then, in his declaration, he attempts to downplay this concession:

> \* \* \*
>
> Q.  *As a general manager at 24 Hour Fitness, what was the highest amount of money you earned in a year?*
>
> A.  I can't really recall the highest amount I ever made.
>
> Q.  Can you estimate?

LITTLER MENDELSON
A Professional Corporation
650 California Street
20th Floor
San Francisco, CA  94108 2693
415 433 1940

DEFTS' MOTION TO STRIKE PLAINTIFFS'
DECLARATIONS

5.

Case No.  C 06 0715 SC

1        A.  *If I was going to estimate, I'd say 160,000*.

2        Q.  And what was the average amount that you would make in a
         year as a general manager?

3
         A.  The years I didn't make 160-, I made around a hundred.

4
Kloosterman Declaration Exh. F (Daniels Depo. at 124:5-17) (emphasis added).  Daniels did not

5
change this testimony when he submitted an errata sheet to his deposition transcript.  Kloosterman

6
Decl. Exh. D.  Instead, Daniels waited until after Defendants filed their decertification motions to

7
contradict his deposition testimony:

8
         Decertification Motion re Manag[e]rs 23:20-26:  24 Hour cites to my
9        testimony for the proposition that "Based on deposition testimony
         payroll records and Plaintiff's damage estimates, we know that some
10       managers earned more than $100,000 per year.  See, e.g., Daniels
         124:5-17 (in best year as a GM, earned about $160,000; in average
11       years, earned about $100,000)".  I understand that 24 Hour is citing to
         this to support the "Highly Compensated" exemption that could
12       potentially [apply] to workers earning over a 100,000 per year on or
         after August 23, 2005.  I am also informed that for managers, the
13       effective claims period ends March 31, 2006 because after that 24
         Hour reclassified us as non-exempt and began paying us hourly.  It is
14       true that I provided that estimate, but 24 Hour's attorneys never asked
         me when that could be.  As I testified in my deposition, my first stint
15       as a GM was from about October 2002 to August 2003 (less than a
         year).  I was then an AGM until about May or June 2004.  Then, I was a
16       GM from May 2004 until March 2005 (less than a year), at which time
         I became a Deputy DM until June or July 2005.  In June of July 2006,
17       I then became a GM until Spring 2007 (less than a year), which I was
         then promoted to club Manager.  I never actually worked a full year as
18       a GM and I was pretty clear in my deposition that I was providing an
         estimate only.  *I have no recollection if for any 52 week period,*
19       *starting and moving forward from August 24, 2003 and ending March*
         *31, 2006, as to whether I or any other club-level manager ever made*
20       *$100,000 or more.*

21  Daniels (Bregman) Decl. ¶77 (Docket #389) (emphasis added).

22       Antoinette Fiedler testified in deposition that her number one priority was banking,

23  but then testified in her declaration that her primary duty was to ensure that the club was clean:

24                              *    *    *

25       Q    And how many hours a day would you say you spent in your
         office at Green Valley?

26
         A    Well, there again, that varied, depending upon the day.  We
27       were encouraged not to spend any more time than what we needed to
         in our office.  You know, there was things -- sometimes if we would
28       have an OM conference call, which we had every week, they could go

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
650 California Street
20th Floor
San Francisco, CA 94108-2693
415.433.1940

DEFTS' MOTION TO STRIKE PLAINTIFFS'
DECLARATIONS                                      6.                    Case No.  C 06 0715 SC

1    two to three hours, so, of course, you were stuck during that time. *Of
2    course, the banking -- that was the No. 1 priority.* The banking had
     to be done in the morning because we had to get it into the banking, so
3    it's the cash.  Checks and credit cards went to corporal office, but the
     cash deposits had to be in usually by eleven o'clock in the morning
4    because your courier came in the afternoon and would pick up the
     checks, the credit cards, your banking sheet.  You had a balance sheet
5    that you had to fill out every day, whatever contracts that the
     salespeople had sold, you know.  That had to go into the courier bag.
6    If the – the fitness department sold training, that paperwork had to go
     into the corporate offices, you know, to different areas.  If you had
7    something that had to go to a corporate office maybe for billing -- you
     know, people would sometimes change their method of billing.
8    Maybe they were on one credit card and they would change it to
     another credit card, or they had a checking account and they changed it
9    to a credit card.  Those type of things would go to our main billing
     area.    It depended on -- some days were heavier than others.
10   Sometimes we would have to gather all of the time sheets and put
     those in, so that could go into the payroll department at the corporate
11   office.  We would verify, you know, with our district manager, that,
     you know -- always -- we always had to check in with them, make sure
12   this paperwork was completed in the courier bag, and, you know, it
     had to be ready.  So it just depended upon the workflow of the day.

13   Kloosterman Declaration Exh. G (Fiedler Depo. 48:24-50:17) (emphasis added).   Fiedler did not

14   change this testimony in her deposition errata.  Kloosterman Decl. Exh. D.  In her declaration, she

15   testifies:

16       **Operations Manager.**  Although I held the title of a club-level
         Operations Manager, my primary duties were non-management duties
17       to assist the operations of the club to meet its primary goal of
         maximizing sales. *My primary duty was to ensure that the club was*
18       *clean 24 hours a day.*   Sales cannot be made unless the club is
         spotless.  Over 90% of my duties consisted of routine clerical work,
19       sales (36:17-37:14) and greeting members....

20   Fiedler Decl. ¶54 (Docket #391) (emphasis added).  Other deponents claim to have "later learned"

21   contradictory information, but failed to explain when, how, or from whom they supposedly learned

22   it.  See, e.g., Beauperthuy Decl. ¶4 (Docket #387); Cromartie Decl. ¶9 (Docket #389); Grubbs Decl.

23   ¶6 (Docket #393); Symmonds Decl. ¶5 (Docket #400).[1]

24       The new declarations also conflict with declarations that Plaintiffs filed in support of

25   their motion for conditional certification.  For example, Kelly Fennelly (Hillenbrand) stated in her

26   December 2006 declaration that she was a Fitness Manager for "years."  Declaration of Kelly

27

28   [1]   EVIDENTIARY OBJECTION:  Defendants object to such declaration testimony that they "later
     learned" the contradictory information to the extent such testimony is hearsay. Fed. R. Evid. 802.

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
650 California Street
20th Floor
San Francisco, CA  94108 2693
415 433 1940

DEFTS' MOTION TO STRIKE PLAINTIFFS'                7.                    Case No.  C 06 0715 SC
DECLARATIONS

1   Fennelly In Support Of Plaintiffs' Motion For Facilitated Notice Of FLSA Collective Action

2   (Docket #75) ("From my _years_ as 24 Hour Fitness Manager....") (emphasis added).   In her

3   deposition, Fennelly (Hillenbrand) testified that she was a Fitness Manager for "two months max."

4   Kloosterman Decl. Exh. H (Hillenbrand Depo. 74:2-76:1).  Also, in her 2006 declaration Fennely

5   (Hillenbrand) testified that "Operations Managers...were allowed to hire employees at a certain pay

6   rate...." (_Id._ at ¶34), but in her deposition, she testified that she only "screened" applicants and

7   "actually didn't officially hire them...."   Kloosterman Decl. Exh. H (Hillenbrand Depo. 128:25-

8   130:25).

9         John Davidsson stated in his December 2006 declaration that he "recruited and

10   recommended new Trainers."  Declaration Of John Davidsson In Support Of Plaintiffs' Motion For

11   Facilitated Notice ¶17 (Docket #390).   In his deposition, he backpedaled by offering the following

12   lengthy explanation:

13                                *   *   *

14              Q.:    On Page 6, Paragraph 15, what did you mean when you
              stated, "A fitness manager at 24 Hour Fitness is a position of 'lead'
15              personal trainer whose job functions including both supervising other
              personal trainers and recruiting and training new personal trainers as
16              well as  providing training sessions to members, as needed"?   What
              did you mean when you said "recruiting and  training new personal
17              trainers"?

18              A.   _In the context of 24 Hour Fitness recruiting was  limited to_
              _who we would suggest take the SeleXpert test._   So, for example,
19              someone walks into the facility  and says, I want to be a personal
              trainer.  We can certainly  always give them that advice, to go to
20              SeleXpert.  But if  they have no credentials, as I've stated, personal
              training  credentials, that was the very little discretion that we had  as
21              far as recruiting.  But, I mean, we could send people to SeleXpert.

22              Q.   Okay.  And in Paragraph 17, you say, "I also recruited and
              recommended new trainers.  My primary focus  and responsibility as a
23              fitness manager was motivating the trainers to meet the revenue goals
              that were assigned by the company to our individual club."  What did
24              you mean when you said, "I also recommended and recruited new
              trainers"?
25
              A.   Same as above, really, in terms of that language of recruiting,
26              because _that's all we could do is really  recommend they take the test_
              _or perhaps not take the test or go out and get a certification, perhaps,_
27              _before considering employment._

28   Kloosterman Decl. Exh. I (Davidsson Depo. 152:5-153:8) (emphasis added).   Plaintiffs cannot

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
650 California Street
20th Floor
San Francisco, CA 94108 2693
415 433 1940

DEFTS' MOTION TO STRIKE PLAINTIFFS'
DECLARATIONS

8.

Case No.  C 06 0715 SC

decertification by filing such conflicting declarations. Such tactical maneuvering should not be tolerated. Because the conflicting testimony calls the credibility of all declarants into question, all of Plaintiffs' declarations should be struck.

**B.   The Timing Of The Declarations—*After* Defendants Filed Their Decertification Motions—Further Demonstrates That The Declarations Are Not Credible.**

Altering deposition testimony is especially disfavored where, as here, testimony was modified on the heels of the deponent being made aware of the deposition's shortcomings. In *Hambleton, supra,* 397 F.3d at 1224-1225, the Ninth Circuit rejected changes to deposition testimony where the changes were submitted *after* the other party filed a motion for summary judgment. *See also Laster v. T-Mobile USA, Inc.*, 2009 U.S. Dist. LEXIS 116228, *20-21 n.2 (S.D. Cal. 2009) ("a relevant consideration is the timing of corrections").

Here, the declarants waited until *after* Defendants filed their decertification motions to submit the conflicting written testimony. The deponents had ample opportunity to "correct" their deposition testimony. They could have changed their testimony during the depositions. They could have changed their testimony by making errata changes under Federal Rule of Evidence 30(b). They might even have attempted to submit a declaration prior to the close of discovery. Instead, it was not until after Defendants filed their decertification motion highlighting the deposition concessions that these individuals came forward with the conflicting testimony. This timing is highly suspect. This brazen attempt to rescue their claims through manipulation and rejection of prior, sworn deposition testimony should not be allowed.

**C.   If Anything, The Inconsistent Testimony Demonstrates That Collective Certification Is Not Appropriate.**

As explained in Defendants' moving papers and reply briefs, inability to cross examine witnesses to refute inconsistent statements would result in a denial of due process. The inconsistencies in Plaintiffs' testimony warrant cross examination of each Plaintiff, which is not possible in a collective action. *See Hinojos v. Home Depot, Inc.,* 2006 U.S. Dist. LEXIS 95434 at *7-8 (D. Nev. Dec. 1, 2006) (denying plaintiffs' motion for conditional certification of off-the-clock claims, noting that "the Court is concerned about the contradictions between plaintiffs' declarations

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
650 California Street
20th Floor
San Francisco, CA  94108 2693
415 433 1940

DEFTS' MOTION TO STRIKE PLAINTIFFS'
DECLARATIONS                                    9.                          Case No.  C 06 0715 SC

1   and their deposition testimony, which shows the importance of cross-examination of each plaintiff");

2   *Pacheco v. Boar's Head Provisions Co.,* 671 F.Supp. 2d 957, 965-65 (W.D. Mich. 2009) (denying

3   certification where there were "numerous inconsistencies between Plaintiffs' affidavits and their

4   deposition testimony," finding the contradictions of peculiar concern "because they show[ed] 'the

5   importance of cross-examination of each plaintiff' and suggest[ed] 'the need for separate mini-trials

6   to resolve each claim.'"); *Lugo v. Farmer's Pride, Inc.,* 2010 U.S. Dist. LEXIS 88139 at *60 (E.D.

7   Pa. Aug. 25, 2010) (granting decertification where "the testimony offered by plaintiffs in general is

8   plagued by inconsistencies that diminish its reliability and 'show the importance of cross-

9   examination of each plaintiff."). Without opportunity to cross examine witnesses, Plaintiffs "could

10  characterize their experiences without a realistic fear of direct rebuttal." *Johnson v. BigLots Stores,*

11  *Inc.,* 561 F.Supp.2d 567, 586 (E.D. La. 2008).

12          And this is exactly the situation here. Plaintiffs submitted various sworn declarations

13  in 2006 and 2007. Some of those declarants gave conflicting sworn deposition testimony. 24 Hour

14  then deposed 40 plaintiffs in 2010, all of whom have provided declarations, signed under penalty of

15  perjury, containing testimony inconsistent with their sworn deposition testimony. Some of those

16  inconsistent statements are based on the declarant later learning of new hearsay information. But the

17  declarants do not say who provided the information or when they learned of it. Without the

18  opportunity to cross examine each Plaintiff about their inconsistent testimony, 24 Hour is denied due

19  process.

20  **IV.    CONCLUSION**

21          For the reasons set forth above, Plaintiffs' declarations should be stricken in their

22  entirety.

23

24  Dated: December 6, 2010

25                                          JOHN C. KLOOSTERMAN
                                           LITTLER MENDELSON
                                           A Professional Corporation
26                                         Attorneys for Defendants
                                           24 HOUR FITNESS USA, INC. AND SPORT
                                           AND FITNESS CLUBS OF AMERICA
27

28

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
650 California Street
20th Floor
San Francisco, CA 94108.2693
415.433.1940

DEFTS' MOTION TO STRIKE PLAINTIFFS'
DECLARATIONS                                    10.                        Case No.  C 06 0715 SC

## Exhibit A

Gabe Beauperthuy

| Decl. Paragraph | Conflicting Testimony | Notes |
|---|---|---|
| 4 | 18:23-20:3 | Testified that the GM *interviewed* him and then the DM interviewed him. In his declaration, claims that, although it seemed to be an interview, he would later learn that his real interview was the subsequent one with the DM. |
| 36 | 36:23-37:4 | Testified that although each silo may have had separate goals on paper, everyone had to contribute and everyone was doing someone else's job to help. In his declaration, now says that there was no way for him to step out of his role or duties because he was just there to sell. |

Clifford Cotton

| Decl. Paragraph | Conflicting Testimony | Notes |
|---|---|---|
| 6, 7, 8 | 76:14-77:24 | Testified that "Positions were different, so they varied with position, varied with club" and that it was easier to sell at Highlands Ranch compared to Broadmoor and Colorado Springs because the clientele demographics were different. Declaration now states that club differences made no difference in his job duties. |
| 17 | 84:4-7 | Testified that he understood his pay for *each training session* (with no mention of length) to be a flat rate. In his declaration he tries to say that he understood it to be a flat rate for an hour of the training session. |
| 21 | 26:10-25 | Testified that there wasn't a set schedule, just that he should be there if there "was business to be found." In his declaration states that he had to be in the club 8-8. |

William Clunn

| Decl. Paragraph | Conflicting Testimony | Notes |
|---|---|---|
| 71 | 53:22-55:7 | Testified that, although the goal was always to sell, the differences in the amenities and physical condition of the club affected his ability to do so. He claims in his declaration that there was no difference in his experience in the clubs based on such differences. |
| 52 | 63:24-64:6 | Testified that the tip that he would give his sales counselors was to be honest in their sales, and that this was a characteristic that made him a good salesperson. He claims in his declaration that he never provided any sales advice to FCs unless they asked. |

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
650 California Street
20th Floor
San Francisco, CA  94108 2693
415 433 1940

**DEFTS' MOTION TO STRIKE PLAINTIFFS'
DECLARATIONS**                                          **Case No.  C 06 0715 SC**

Natalie Cromartie

| Decl. Paragraph | Conflicting Testimony | Notes |
|---|---|---|
| 9 | 32:3-17 | Testified that she had one on one meetings with her GM as a fitness counselor and discussed production goals, including appointments, shows, closes, lead generations and EFT. In her declaration she tries to change her testimony by stating that she "would later learn that the GM was merely gathering my data and reporting this information to the DM, acting as an intermediary or facilitator." |
| 11 | 29:4-30:1 | Testified that when she was a fitness counselor and needed time off for illness or vacation, she would call her GM during the week and her AGM on the weekend, and her DM if she couldn't get ahold of them. In her declaration, she attempts to change her testimony by stating that she "would later find out that the GM was just an intermediary between the sales staff and the DM." |

Seth Daniels

| Decl. Paragraph | Conflicting Testimony | Notes |
|---|---|---|
| 52 | 104:1-106:4 | Testified that that he had paid time off days accumulated but "just didn't take it" because "I didn't know, like, what forms to fill out or how to get paid for it, so I just figured I'd get paid on it eventually, so . . ." States in his declaration that he was docked pay if he took a day off because he was sick while he was a manager. |
| 75 | 63:23-64:9 | Testified that trainers made their own hours and wrote their own schedule, but in his declaration says he would have testified differently had he been asked whether his job duties varied depending on when he worked. |
| 77 | 124:5-17 | Despite testifying "Q: As a general manager at 24 Hour Fitness, what was the highest amount of money you earned in a year?    A.  I can't really recall the highest amount I ever made.    Q.  Can you estimate?    A.  If I was going to estimate, I'd say 160,000.    Q.  And what was the average amount that you would make in a year as a general manager?    A.  The years I didn't make 160-, I made around a hundred."  He claimed in the declaration that if he had been asked "when that could be" he would have testified differently and answered that he never earned more than $100,000. |

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
650 California Street
20th Floor
San Francisco, CA 94108.2693
415.433.1940

**DEFTS' MOTION TO STRIKE PLAINTIFFS' DECLARATIONS**                    **Case No.  C 06 0715 SC**

John Davidsson

| Decl. Paragraph | Conflicting Testimony | Notes |
|---|---|---|
| 88 | 101:13-22; 152:2-154:12 | Davidsson, who left 24 Hour in January 2005, submitted a declaration in 2006 stating that his job functions included "recruiting and training new personal trainers," yet in his deposition he testified he could not do these things.  When confronted with the inconsistency at his deposition, he claimed that what he meant by recruiting was telling people who walked into the club that they could apply on-line.  He claims now that his deposition testimony was consistent with his declaration because his authority was inherently limited because he said he was just a lead personal trainer. |
| 89 | 37:15-38:4; 45:2-6; 54:19-56:2 | Testified that the hours he worked were different from other trainers and that he worked free training sessions that were not common to all trainers. He attempts to modify his testimony in his declaration by claiming that if he had been asked whether this modified his duties or responsibilities, he would have said no. |

Bobby DeSoto

| Decl. Paragraph | Conflicting Testimony | Notes |
|---|---|---|
| 53 | 74:16-75:24 | Testified that he would interview candidates using the preset questions and also write his own notes about the person that he would pass on to the DM. He also testified that his DM would ask him what he thought about the candidate. In his declaration he claims that he did not interview candidates and only asked the standard set of questions and forwarded the answers to the DM. |

Lawrence Dickerson

| Decl. Paragraph | Conflicting Testimony | Notes |
|---|---|---|
| 72 | 79:8-17 | Testified that he served as both the OM and GM for several months. In his declaration, he says that this "is the exception that proved the rule" and that he was never asked whether this was the ordinary structure for club level managers. |
| 74 | 131:22-132:4 | Testified that he completed employee reviews, including a rating which affected the employee's compensation. In his declaration, he attempts to modify his testimony by saying that he only did so when directed to by his DM and that it was not a regularly performed duty. |

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
650 California Street
20th Floor
San Francisco, CA  94108 2693
415.433.1940

**DEFTS' MOTION TO STRIKE PLAINTIFFS'
DECLARATIONS**

**Case No.  C 06 0715 SC**

Anne Dillon

| Decl. Paragraph | Conflicting Testimony | Notes |
|---|---|---|
| 38 | 56:25-57:2; 62:2-10; 63:15-22; 65:9-66:1 | Testified that as an OM she had to do all kids of paperwork. She gave a very detailed description of what was involved in banking: taking cash register tills and reconciling them, filing out a lot of paperwork, dealing with credit card slips, checks and money, filing out the banking slips and going to the bank. She testified that doing the banking took a couple of hours each day (and longer on Mondays and close-outs). She also testified that she had to reconcile member agreements every day to make sure they were correctly filled out. She also handled cancellation paperwork (Washington law provides for a 3-day cancellation window). In her declaration, she claims that she performed only clerical functions, "jotting 'i's and crossing 't's..." |
| 12 | 88:2-90:23 | Testified that she would conduct first round group interviews with her GM and FM and pass along the information to her DM. She also participated in second round interviews. In her declaration, she claims that this was not her normal experience and that if she had been asked how frequently the interviews occurred she would have said that they occurred infrequently and that her DM didn't take anything she said into serious consideration. |
| 40 | 97:14-98:2, 98:23-99:6 | Testified that her DOM was inconsistent. If the club's numbers started to fall, she'd be at the club more, if the numbers were good she wouldn't visit much at all, and instead they would just talk on the phone maybe once a day, or sometimes just exchange voicemails. In her declaration, she claims that she wasn't asked what effect the frequency of DM visits had on her role or duties, and that if she had been asked she would have explained they were the same. |

Toni Fiedler

| Decl. Paragraph | Conflicting Testimony | Notes |
|---|---|---|
| 28 | 122:12-124:12 | Testified that she would fill out evaluation forms for her employees and that she would discuss with her DM her observations about the employee's strengths and weaknesses, whether they need more training, what their job expectations were, and they'd fill out the comments section based on that. Fiedler would then sit down with the employee and go over the review with him or her. Fiedler now claims in her declaration that her DM would "tell me what to write down for the 'evaluation' portion of the form" failing to mention that the comments were based on a discussion of Fiedler's observations of the strengths and weaknesses of the employee. |
| 54 | 48:24-50:17 | Testified that her duties with respect to banking were "the No. 1 priority." In her declaration, she states that her primary duty was ensuring that the club was clean. |
| 54(h) | 53:17-54:3; | Testified that she reviewed the timesheets of the operations |

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
650 California Street
20th Floor
San Francisco, CA  94108.2693
415.433.1940

| | 56:13-23 | employees to ensure they corresponded to the scheduled hours and that she would be aware of it if an employee worked extra hours over what they were scheduled. She testified that she made sure that the timesheets were signed and there was nothing missing on the timesheet - if there was, she would tell them that they needed to correct it. In her declaration, she claims that, at most, she "perused it to see that the numbers on the timesheet matched the posted schedule..." |

Tina Flores

| Decl. Paragraph | Conflicting Testimony | Notes |
|---|---|---|
| 26 | 22:6-23:7 | Testified that for a period, GMs had supervisory authority over OMs and supervised the entire club. Around 2000 that changed on paper, but it did not really change in practice. It didn't change in practice until around 2002 or 2003. In her declaration she states that all club-level managers were co-equal and the only deviation was early on in her career when the DM position was vacant. |
| 49 | 81:16-83:18 | Testified that she selected applicants based on her criteria (good penmanship), called applicants for a group interview, interviewed them and then told her DM which applicants she liked and asked the DM to interview just those applicants.  She claims in her declaration that she only did what her DM told her to do. |
| 51 | 105:15-106:8 | Testified that there was a productions side and an operations side, and that this changed over her career. She claims in her declaration that she is not aware of a shift from two silos to three silos. |

Garth Gelker

| Decl. Paragraph | Conflicting Testimony | Notes |
|---|---|---|
| 14, 99 | 96:11-20 | Testified that larger facilities made it easier for him to make sales goals. He attempts to modify his testimony by stating in his declaration that his duties and work were the same regardless of physical club differences, and that the only difference was in his paycheck. |

Adam Grubbs

| Decl. Paragraph | Conflicting Testimony | Notes |
|---|---|---|
| 6 | 26:16-31:13 | Testified that he was hired as a FC by the GM and FM who interviewed him for around an hour, the OM gave him the application, and the GM offered him the job. He attempts to modify his testimony by stating that he "would later learn that it was the DM who had actually hired me." |
| 19 | 176:3-177:10 | He testified that a list of tasks including GMS cleanup was a guide for what he needed to do most days as a GM, but attempts to state in his declaration that it was something that could be done very rarely |

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
650 California Street
20th Floor
San Francisco, CA 94108 2693
415 433 1940

**DEFTS' MOTION TO STRIKE PLAINTIFFS' DECLARATIONS**                    Case No.  C 06 0715 SC

| 45 | 121:1-122:2 | Testified that he would tell his DM his impressions of potential new hires he met with, and that he DM would ask him about his meeting with the potential new hire. He attempts to change his testimony by stating that the "DM seemed mainly to care about the written down answers to the preset questions. I don't believe he took my thoughts on whether the candidate was nice or presentable into consideration." |

### Victoria Hadipour

| Decl. Paragraph | Conflicting Testimony | Notes |
|---|---|---|
| 70 | 124:1-125:17 | Testified that earlier in her career with 24 Hour Fitness she had to process manual documents, which took longer. Attempts to modify her testimony in her declaration by stating that "just because paperwork took me longer before certain computer programs were implemented, did not change my duties." |
| 71 | 27:12-14; 54:16-23; 69:8-70:6 | Testified that training her OMs was her specialty as a DOM, but that as an OM she was given a manual and told that she would sink or swim. She attempts to modify her testimony in her declaration by stating that "whether an OM had training by a DOM or by shadowing another OM or whether he or she had to learn the job like I did, all that affect was the stress level of the first few months of the position...like any company, some were better at the jobs than others, but that did not change the job duties that all performed." |

### Shane Hedani

| Decl. Paragraph | Conflicting Testimony | Notes |
|---|---|---|
| 105 | 75:16-76:6 | In his deposition, he was asked if he was responsible for dividing up fit hours and if anyone complained to him that they should be given more fit hours; he did not mention fit-hour distribution affecting pressure to work off the clock. In his declaration he now states "I was never asked at my deposition whether the way fit hours were distributed affected the pressure to work off the clock. If I had been asked directly, I would have answered truthfully that they did not." |

### Cory Hennessy

| Decl. Paragraph | Conflicting Testimony | Notes |
|---|---|---|
| 25 | 183:13-15 | Testified that, with respect to meeting with applicants and asking them the SeleXpert questions, "you could kind of consider that an interview." Now claims in his declaration that this was not an interview. |
| 14 | 143:21-144:11 | Testified that the assistant operations manager reported to him when he was operations manager. Now claims in his declaration that "The 'manager' did not have real management authority or real administrative responsibility." |

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
650 California Street
20th Floor
San Francisco, CA  94108 2693
415 433 1940

**DEFTS' MOTION TO STRIKE PLAINTIFFS'
DECLARATIONS**

**Case No.  C 06 0715 SC**

| 25 | 185: 4-8 | When asked in his deposition what types of positions he had a role in hiring, he testified "I could say I had a role in all of them." Now claims in his declaration that "I did not have any authority on who to hire." |

**Kelly Hillenbrand**

| Decl. Paragraph | Conflicting Testimony | Notes |
| --- | --- | --- |
| 89 | 81: 4-10 | Testified that she switched to Operations Manager because she "was tired of production and all the yucky stuff that came with it. So I thought that maybe it would be different on the other side." Now claims that "Had I been asked at my deposition, I would have answered [that my motivation in switching to operations manager did not affect my job duties]." |
| 41, 42 | 126:16-127:20 | Testified that it was up to her and her Assistant Operations Manager to hire, but her Supervisors had to make sure candidates were the right fit "as well." Now claims in her declaration that the decision to hire a candidate was solely up to the DM and Human Resources Dept. |
| 41-42 | 130:4-19 | Testified that she admits that in her December 2006 declaration she stated "I was given the authority to hire." Now claims in her declaration that the decision to hire a candidate was solely up to the DM and Human Resources Dept. |

**Michelle Janke**

| Decl. Paragraph | Conflicting Testimony | Notes |
| --- | --- | --- |
| 9, 27, 29, 37 | 70:9-15 | Testified that the Assistant Operations Manager reported to her. Now claims in her declaration that she had no managerial authority whatsoever. |
| 9, 19-20 | 36:23-37:2; 121:15-122:16 | In her deposition, when asked how many employees she supervised when she became a club operations manager, she said "five to ten people" and testified that she had new employees review manuals and shadow other employees.  She kept a board in her office listing what the new employee had to do each day. Now claims in her declaration that she had infrequent participation in training and no real management authority. |

**Brent Johnson**

| Decl. Paragraph | Conflicting Testimony | Notes |
| --- | --- | --- |
| 38 | 103:4-105:4 | Testified that he would review applications and select individuals for interviews based on their job history and schedule. He would sometimes have the front desk supervisor do the initial interview, and then he would do the secondary interview, and sometimes he would do the initial interview. Regardless of whether he did the first or second interview, he had the final say on hiring as long as it followed the pay scale guidelines. He now claims in his declaration that "24 |

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
650 California Street
20th Floor
San Francisco, CA 94108 2693
415 433 1940

|  |  | Hour's attorneys never asked me why I was able to hire or how frequently I "hired." Had they done so, I would have explained that my DM delegated that authority to me. I also would have told them that in terms of hiring, I did not participate in that process customarily or regularly." |
| --- | --- | --- |
| 13 | 145: 19-25 | Testified that he gave advice to employees about how to improve, without first seeking DM approval. Now claims in his declaration that if he ever trained employees, it was at the direction of a District Manager. |

David Kaipi

| Decl. Paragraph | Conflicting Testimony | Notes |
| --- | --- | --- |
| 16 | 44:14-16 | When asked in his deposition if, in his job interview, he was told he would be overseeing other employees, he responded "I think that would be a definition of manager." Now claims in his declaration that his job was not to oversee the other trainers. |

Quinton Kaplan

| Decl. Paragraph | Conflicting Testimony | Notes |
| --- | --- | --- |
| 15 | 88:11-16 | In his deposition, when asked if he told District Operations Manager, Bill, what he thought of the applicants based on his interactions with them, he testified "it might have happened." Now claims in his declaration that, regarding hiring, "I do not recall my DM asking for recommendations from me, and I do not recall providing any." |
| 29, 39 | 101:5-10 | Testified that could count on him dropping by the Kids' Club "every day" to "oversee operations." Now states in his declaration that he did not direct others' work; that non-managerial duties comprised 90% of his work. |

Belton Lubas

| Decl. Paragraph | Conflicting Testimony | Notes |
| --- | --- | --- |
| 76 | 152:25-154: 7 | Testified that, while employed at a pre-sale location, he sold memberships and there were no trainers. In his declaration he now claims that "24 Hour claims that my duties were different at the pre-sale location because I sold memberships and there were no trainers . . . I was never asked about it, and had I been I would have answered that my main responsibilities as an FM were the same at any other club location." |
| 43, 45 | 129:11-17 | Testified that while a fitness manager, he gave formal performance reviews to trainers once per month. Now states that he did not mentor any trainers who wanted to get promoted; his only discipline authority was to report a violation. |

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
650 California Street
20th Floor
San Francisco, CA. 94108 2693
415 433.1940

**DEFTS' MOTION TO STRIKE PLAINTIFFS' DECLARATIONS**                                        **Case No. C 06 0715 SC**

Cindy Magnani

| Decl. Paragraph | Conflicting Testimony | Notes |
|---|---|---|
| 34, 52 | 35:17-21 | In her deposition, when asked if she would set a written schedule for the sales team when she was the sales manager, she said "usually . . . yeah." Now claims in her declaration that I didn't do very much when it came to scheduling employees . . . I did not have the ability to change the schedule or decide to make up a schedule whenever I wanted." |
| 29 | 37:24-38:7 | In her deposition, when asked if she gave supervisor information on whether she personally thought the person would be a "good fit for your sales team," she said "yeah, I would have to say, I wouldn't want this person, or they seemed kind of like they wouldn't fit in, because it would benefit me." In her declaration, she now claims that she had minimal involvement with the hiring process; "it's true that occasionally, I would let the DM know if I thought the person might be a credible salesperson." |

Michael Marino

| Decl. Paragraph | Conflicting Testimony | Notes |
|---|---|---|
| 83 | 183:21-185:16; 211:4-213:6 | Testified that he suggested typing up a written warning if a trainer was failing to meet production goals. He would meet the employee with a witness and then send documentation to his DM or to HR. When the master appointment book contained entries that "didn't look right" he turned the matters over to loss prevention and as a result, two trainers in different clubs were terminated. In his declaration he now claims "I was not asked how often [I was able to discipline employees] while I was there. If I had been, I would have explained that it did not happen customarily or regularly, it was on an ad hoc basis, when and how directed by my DM." |

Richard McGrath

| Decl. Paragraph | Conflicting Testimony | Notes |
|---|---|---|
| 35 | 58:23-59:1 | Testified that he got paid his full salary regardless of the number of hours he worked. Now claims in his declaration that "During my deposition when I was asked if I was paid my full salary regardless of the number of hours I worked, I answered "yes. . . . However, I was never asked what would happen if I worked less than 40 hours. Had I been asked this question, I would have answered that I believed if I worked less than 40 hours, then I would not have received my full base pay." |

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
650 California Street
20th Floor
San Francisco, CA 94108-2693
415.433.1940

**DEFTS' MOTION TO STRIKE PLAINTIFFS'
DECLARATIONS**                                    Case No.  C 06 0715 SC

Megan Olsen

| Decl. Paragraph | Conflicting Testimony | Notes |
|---|---|---|
| 72, 76 | 96:13-16; 97:7-25 | Testified that "If we wanted to, we could choose a specific person" to assign agreements to. If more than one trainer felt they should have had a particular new client, she said "we gave the clients to who we felt that they went to. And if they had a problem, they could talk to the district fitness manager." Now claims in her declaration that "I did not direct the work of others"; Managers did not have independent judgment or discretion. |

Louis Ortiz

| Decl. Paragraph | Conflicting Testimony | Notes |
|---|---|---|
| 37-38 | 56:10-20 | Testified that no one told him he needed to work more hours off the clock than the hours he was scheduled to work. He was only told if employees choose to work off the clock they will not be compensated. Now claims in his declaration that "It was the culture of 24 Hour Fitness for any employee, whether a FM, FC or a PT, to work as much as needed in order to hit your goals." |
| 43, 44 | 77:19-78:5 | In his deposition, he admitted he was part of the interview process; says the district managers wanted him to give them an idea of whether the candidates were well-groomed, in good shape, and presented themselves well – their "first impression." In his declaration he now claims that he did not offer any input to the DM as to whether he thought a candidate interviewed well or would make a good employee; did not have any authority to offer input or decide who should be hired. |

Joeleen Palmeri

| Decl. Paragraph | Conflicting Testimony | Notes |
|---|---|---|
| 33 | 86:20-87:19 | Testified that she gave her DM information that contained notes on questions when she met with applicants. Now claims in her declaration that she does not recall writing down any subjective opinions on the applicants. |
| 46 | 122:15-20 | Testified that the DM visited "not too often...maybe once a week or every two weeks, estimate." Now claims in her declaration that DMs and area fitness directors made in person visits "at least" once per week or once every two weeks, |

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
650 California Street
20th Floor
San Francisco, CA 94108 2693
415.433.1940

**DEFTS' MOTION TO STRIKE PLAINTIFFS'
DECLARATIONS**                    Case No.  C 06 0715 SC

Carmen Pieske

| Decl. Paragraph | Conflicting Testimony | Notes |
|---|---|---|
| 49 | 115:17-117:16 | Testified that she "was very vocal" about how her staff performed and that she believes people were promoted based on this. In her declaration, she claims that she was never asked how frequently that occurred and that she would have testified that it was not regular and that it was less frequent than once a week or even month. |
| 52 | 54:18-55:3 | Testified that "things changed a lot" with respect to specific duties during the time she was an OM. IN her declaration, claims that in her depo she was referring to the change in paperwork not the change in the OM position |

Alfred Ra'Oof

| Decl. Paragraph | Conflicting Testimony | Notes |
|---|---|---|
| 111 | 135:17-136:18 | Testified that his previous experience made him a better salesperson. In his declaration, he states that while he did state at his depo that his previous experience may have made him a better salesperson, he was not asked whether this changed his job duties and had he been asked he would have said he had the same job duties as other GMs. |

Patricia Rangasajo-Drake

| Decl. Paragraph | Conflicting Testimony | Notes |
|---|---|---|
| 28 | 167:21-169:23 | Testified that she investigated employees and checked their performance, and spent several hours each month doing so. In her declaration, she claims that she never had to perform a detailed investigation into whether someone was doing their job well and would only give information on someone's performance to the DM when asked. |
| 22 | 160:21-162:25 | Testified that she would provide feedback to her DM after meeting with an applicant and would give her impression of what the applicant was like in person including whether they answered the questions well. She stated that she believed her input as to whether she wanted to hire them wasn't given much weight because the DM made the decision. In her declaration, she now claims she didn't actually provide an opinion of whether the person should be hired. |
| 63 | 88:19-90:17 | Testified that the Hawaii clubs were "left alone a lot." In her declaration, she states that while she did state at her depo that the Hawaii clubs were "left alone a lot," this did not change her daily role or duties. |

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
650 California Street
20th Floor
San Francisco, CA 94108 2693
415.433.1940

**DEFTS' MOTION TO STRIKE PLAINTIFFS' DECLARATIONS**                    Case No.  C 06 0715 SC

1

Matthew Reiter

| Decl. Paragraph | Conflicting Testimony | Notes |
|---|---|---|
| 58 | 76:2-13 | Testified that he wanted to be a FM because he wanted to teach other trainers how to train. In his declaration, he states that while he did state at his depo that he wanted to be a FM because he just wanted to each other trainers how to train, what he actually meant was that he wanted to lead them by example and did not have authority to teach them to train. |
| 85 | 153:15-20 | Testified that he was paid the same salary no matter how many hours he worked. He now claims in his declaration that while he did state at his depo that he was paid the same salary amount no matter how many hours he worked, what he actually meant was that he was paid the same amount as long as he worked over 40 hours per week |

Bonnie Rinta

| Decl. Paragraph | Conflicting Testimony | Notes |
|---|---|---|
| 64 | 122:17-128:10 | Testified that, while she worked at a pre-sale location she was the only manager and sold training sessions normally sold by a trainer or FM and did paperwork normally done by an OM. In her declaration, she claims that being the only club-level manager did not affect her job duties. |
| 66 | 44:14-22; 47:25-48:7 | Testified that no one told her to prospect for new clients off the clock and said that it was her impression of how to be successful. She claims that she actually meant that working off the clock was expected and implied by the DMs. |

Chad Ruf

| Decl. Paragraph | Conflicting Testimony | Notes |
|---|---|---|
| 98 | 96:16-23, 99:4-19 | Testified that when he worked in a pre-sale location he worked out of a double-wide trailer; potential members donned construction hats and toured the construction site rather than the club. In his declaration, he claims that this did not change his duties. |
| 99, 102 | 88:13-89:6 | Testified that, because he had previously been a DFM, when he was a FM the DFM essentially said "whoa, he's been a district manager so we'll leave him alone" and that "they kind of left me alone in the club." In his declaration, he claims that it was because he hit his goals and that he was not able to exercise any more discretion than anyone else and that he did not function any more independently than any other FM. |

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
650 California Street
20th Floor
San Francisco, CA  94108-2693
415.433.1940

**DEFTS' MOTION TO STRIKE PLAINTIFFS' DECLARATIONS**

**Case No.   C 06 0715 SC**

Dennis Sciacca

| Decl. Paragraph | Conflicting Testimony | Notes |
|---|---|---|
| 59 | 120:5-10; 124:18-22; 169:9-23 | Testified that he asked candidates specific questions and sent the responses to his DM.  The questions included ones that asked for Sciacca's subjective input on the interviewee's attributes, such as, "determine whether [the interviewee] can effectively demonstrate his ability to motivate others" and "listen for rapport and ability to put others at ease." His DM would ask him questions about the applicant and he indicated whether he thought the applicant had the ability to put others at ease and build rapport. In his declaration he claims that he was never asked whether he used subjective criteria or whether there were company rules for responding. Notably, he does not claim that he did not use subjective criteria or that there were any such rules. |

Harley Spencer

| Decl. Paragraph | Conflicting Testimony | Notes |
|---|---|---|
| 78 | 32:1-10 | Testified that his FM never told him to record less hours than he actually worked. In his declaration, he claims that doing so was the only way to keep his job and that he would not be compensated for unscheduled time he worked. |
| 66 | 46:13-18 | Testified that the demographics of certain clubs made it harder to sell. In his declaration he claims that working at one club is the like working at any other. |
| 52 | 76:18-77:17 | Testified that he disciplined a trainer who did not meet sales goals, and had to handle the termination and deliver the termination paperwork from Human Resources.  In his declaration he claims that this was all at the request of the DM and that he told the employee only what the DM told him to say, although at his deposition he couldn't recall the conversation with specificity and never said he told the employee what his DM told him to. |

Lawrence Srubas

| Decl. Paragraph | Conflicting Testimony | Notes |
|---|---|---|
| 38 | 52:5-19; 53:25-54:9 | Testified that whether or not he got paid for all of his FIT Hours depended on who his FM was at the time.  Under FM Tony Kuo, he claimed he was only paid for his FIT Orientations but not other non-session hours.  However, when Eric Hood took over as FM after Kuo was terminated, "the payment structure was more equitable" and he was paid for all of the non-session hours for which he was scheduled.  This continued under subsequent managers. His declaration now states that he does not know if they were making those decisions themselves or if the DM was making them. |
| 39 | 79:8-81:15 | Testified that when his FM told him he could not be in uniform |

LITTLER MENDELSON
A Professional Corporation
650 California Street
20th Floor
San Francisco, CA 94108.2693
415.433.1940

**DEFTS' MOTION TO STRIKE PLAINTIFFS' DECLARATIONS**

**Case No.  C 06 0715 SC**

| | | prospecting clients at the club unless he was on the clock, he began to prospect for clients on his own time while working out at the club. He now claims that his FM told him he had to work off the clock. |
| --- | --- | --- |
| 40 | 69:19-70:15 | Testified that he after the time and labor system was implemented, he clocked in when he arrived and clocked out when he left or when his shift was over and that he was paid for all hours for which he was clocked in. He now claims in his declaration that he really meant that he sometimes kept working after he clocked out. |

Maika Symmonds

| Decl. Paragraph | Conflicting Testimony | Notes |
| --- | --- | --- |
| 5 | 19:19-20:19 | Testified only that when he applied for a position at 24 Hour Fitness, he initially met with the GM and then met with DM. He now claims that he would later learn that the GM was asking him pre-printed questions and would deliver his answers to the DM, that the GM had no say on whether he was hired, and that he received an "actual interview" with the DM based only on the answers to the pre-printed questions. |
| 10 | 24:22-25:8 | Testified that he logged 40 hours a week although he "may have worked more." He claims in his declaration that he "most likely worked more." |
| 65 | 49:12-51:4 | Testified that he believed that he would be docked pay for working less than 40 hours a week, but could not recall it ever happening and could only recall an instance in which 24 Hour Fitness overpaid him and he had to pay it back. In his declaration he states that it is not true that he received the same fixed salary no matter how little he worked and that if he missed work without PTO that time would be deducted from his pay. |

Connie Wusterbarth

| Decl. Paragraph | Conflicting Testimony | Notes |
| --- | --- | --- |
| 16 | 21:17-22:25 | Testified that she interviewed with the GM or the DM and could not recall which. In her declaration, she now claims that she interviewed with the DM. |
| 72 | 35:20-22 | Testified that she trained 7-10 customers a day. In her declaration, she now states that the number of customers she had versus another trainer did not change her main duties. |
| 59 | 111:1-18 | Testified that she received the same amount of salary no matter how few or how many hours she worked as a FM. In her declaration, she now claims that if a club-level manager had no accumulated paid leave and needed to take time off, he or she would lose the salary for that time off. |

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
650 California Street
20th Floor
San Francisco, CA  94108.2693
415.433.1940

**DEFTS' MOTION TO STRIKE PLAINTIFFS' DECLARATIONS**

Case No.  C 06 0715 SC

1

Stephanie Yamada

| Decl. Paragraph | Conflicting Testimony | Notes |
|---|---|---|
| 64 | 85:11-86:9 | Testified that she would show her employees the manuals and training guides and they would go over them with her.  She would also do a club orientation for a new employee, sometimes from another silo.  In her declaration, she now states that anyone could have done these duties and that she did not consider performing the orientation to be training. |
| 65 | 88:22-89:22 | Testified that she gave performance evaluations to the employees in Operations.  She assisted in putting them together by reviewing production reports and submitting the information to the DOM who formalized the review and sent it to corporate.  She sometimes later would go over the review and any raise with the employee. In her declaration, she now claims that it was not her responsibility to give evaluations and that she did not discuss pay raises with them. |

2

3

4

5

6

7

8

9

10

11

Firmwide:99009883.1 034670.1216

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
650 California Street
20th Floor
San Francisco, CA 94108 2693
415 433 1940

**DEFTS' MOTION TO STRIKE PLAINTIFFS'
DECLARATIONS**

**Case No.  C 06 0715 SC**